# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
#### 3:18-cv-588-MOC-DSC

| | | |
|---|---|---|
| CLAIRE REFAEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | **ORDER** |
| | ) | |
| AETNA LIFE INSURANCE COMPANY, | ) | |
| BANK OF AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the Court on a Motion for Summary Judgment filed by Plaintiff

Claire Refaey, (Doc. No. 21), on a Motion for Summary Judgment filed by Defendant Aetna Life

Insurance Company, (Doc. No. 23), and on a Motion for Summary Judgment filed by Defendant

Bank of America Corporation, (Doc. No. 24). The Court held a hearing on the motions on

October 24, 2019, and this matter is ripe for disposition.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A.     Procedural Background to Plaintiff's Disability Claim

Plaintiff Claire Refaey, a former Bank of America employee and executive, brings this

action against Defendants Aetna Life Insurance Company and Bank of America under the

Employment Retirement Income Security Act, 29 U.S.C. § 1132(a)(1)(B), alleging that she is

entitled to long-term disability benefits under an insurance plan in connection with Bank of

America's Group Benefits Program ("the Plan"). Plaintiff seeks back benefits and injunctive

and/or declaratory relief, requiring Aetna to pay to her ongoing future benefits. Aetna denies

that Plaintiff is entitled to any long-term disability benefits under the Plan and has moved for

1

summary judgment.  Bank of America has also moved for summary judgment, arguing that it has

been wrongly named as a Defendant in this action.

### B. The Pertinent Plan Provisions

The pertinent Plan provisions define eligibility for long-term disability benefits as

follows:

> From the date that you first became disabled and until monthly benefits are payable for 18 months you meet the test of disability on any day that:
>
> ●     You cannot perform the material duties of your own occupation solely because of an illness, injury or disabling pregnancy-related condition; and
> ●     Your earnings are 80% or less of your **adjusted predisability earnings**.
> ***After the first 18 months of your disability*** that monthly benefits are payable, you meet the plan's test of disability on any day you are unable to work at any **reasonable occupation** solely because of an **illness, injury** or disabling pregnancy-related condition.[1]
>
> . . . .
>
> **Material Duties**
>
> Duties that:
>
> ●     Are normally needed for the performance of your own occupation; and
> ●     Cannot be reasonably left out or changed.  However, to be at work more than 40 hours per week is not a material duty.
>
> **Own Occupation**
>
> The occupation that you are routinely performing when your period of disability begins. Your occupation will be viewed as it is normally performed in the national economy instead of how it is performed:
>
> ●     For your specific employer; or
> ●     At your location or work site; and
> ●     Without regard to your specific reporting relationship.
>
> ….
>
> **Reasonable Occupation**
>
> This is any gainful activity:

---

[1] Here, the first benefit eligibility date for LTD was March 29, 2016, and the eighteen-month test change date was September 29, 2017.

● For which you are, or may reasonably become, fitted by education, training, or experience; and
● Which results in, or can be expected to result in, an income of more than 60% of your adjusted predisability earnings.

(Id. at 261–78).

The Plan contains and is subject to the following language:

**Claim Determinations; ERISA Claim Fiduciary.** For the purpose of section 503 of Tide 1 of the Employee Retirement Income Security Act of 1974, as amended (ERISA) … We shall have discretionary authority to determine whether and to what extent eligible employees and beneficiaries are entitled to benefits and to construe any disputed or doubtful terms under this Policy, the Certificate or any other document incorporated herein. We shall be deemed to have properly exercised such authority unless We abuse our discretion by acting arbitrarily and capriciously.

(Id. at 362).

### C. Plaintiff Develops a Viral Illness in 2015 While Employed with Bank of America

Plaintiff, born in 1980, earned a bachelor's degree at Michigan State University in 2003, and a masters in business administration through the Wake Forest University School of Business Management in 2007. Plaintiff specialized in supply-chain management, and she began working for Bank of America in 2005. While working for Bank of America, she rose through the corporate ranks, attaining Vice President titles as a Sourcing Manager II (2006) and a Technology Project Manager (2009), then as a Senior Vice President as a Service Delivery Manager (2010), a GT & O Strong Risk Management Program Lead (2013), and finally as an Executive, titled Chief Operating Officer of the bank's Global Technology & Operations Third Party Program (2014).

In late September 2015, Plaintiff developed a viral illness, resulting in two consecutive admissions to Carolinas Medical Center (CMC) Main, with diagnoses of nausea and vomiting with abdominal pain, anemia, severe inflammatory gastroenteritis, severe hypotension, anxiety,

3

and fatigue. Plaintiff first visited the CMC emergency department on the night of September 26,

2015, reporting abdominal pain, nausea, and diarrhea, followed by weakness in the extremities

and inability to walk. (AR at 598). Plaintiff was admitted to the hospital, where she remained

until October 2, 2015. (Id. at 1020). An abdominal CT scan, ultrasound, x-rays of the chest and

abdomen, and lumber puncture were unremarkable. (Id. at 1019–20). She was effectively

treated for hypotension and given broad spectrum antibiotics for suspected, systemic

inflammatory response (which treatment was ultimately discontinued before discharge). (Id. at

606, 1019). No further antibiotics or anti-inflammatories were prescribed on discharge. While

hospitalized, Plaintiff asked to consult with a psychiatrist for "substantial anxiety" due to her

work and was prescribed Klonopin and referred for outpatient psychiatric care. (Id. at 611,

1018–19).[2]

Plaintiff returned to the emergency department on October 7, 2015, reporting she had

become weak during a walk and had "slowly collapse[d] to the ground." (Id. at 649). She was

found to have "3/5 strength bilaterally" and she "refuse[d] to walk." (Id. at 658). She was

discharged on October 9, 2015, with instructions to follow up with a neurologist. (Id. at 652–

53). After her release from her second hospital admission, she underwent outpatient care at

Carolinas Rehab, requiring the use of a rolling walker and exhibiting gait and balance deficits,

functional limitations, limited self-management skills, muscle weakness, and stabilization

deficits.

### D. Plaintiff Receives Outpatient Consultation and Treatment

---

[2] Records from later medical treatment reveal that Plaintiff reported a history of anxiety and panic attacks dating back to 2013 or 2014. (Id. at 406). Plaintiff had a doctor's visit for anxiety on September 25, 2015, the day before her emergency department presentation. (Id. at 895).

4

Thereafter, Plaintiff saw several physicians for evaluation. Cardiologist Dr. Framm treated Plaintiff for orthostatic hypotension, which was ultimately resolved and/or ruled out. (AR at 716–18, 724, 726, 732, 261). Dr. Hines, specializing in pain medicine, consulted with Plaintiff and opined that she may suffer from myasthenia gravis. (Id. at 224–27).

On October 14, 2015, Plaintiff saw neurologist Dr. Kaiwen Lin. Plaintiff presented with weakness that was "slowly getting better, definitely not worsening" and complained of "stress at work." (Id. at 914). Plaintiff had largely normal arm/leg strength and "[t]race weakness in the right arm that possibly extinguishes with repeat testing. Same for the right leg." (Id.). On October 14 and on November 4, Dr. Lin noted "some possibly questionable right-sided weakness that appear to be improved somewhat with distraction." (Id. at 893, 915). Electro-myelogram/nerve conduction study, electro-encephalogram, and cranial MRI were negative. (Id. at 893, 900–01, 903, 915). Dr. Lin suggested neuropsychology and chronic fatigue evaluation for Plaintiff's complaints of "fatigue/inability to focus" and approved "2 more weeks of short term disability but none beyond." (Id. at 894). Dr. Lin also referred Plaintiff to Dr. Ashok Patel for further electrodiagnostic testing of the legs. (Id. at 1097). Plaintiff's results were normal, and Dr. Patel noted that she exhibited "significantly poor effort" during the examination. (Id.).

On December 17, 2015, Plaintiff met with Dr. Meredith Faulkner to establish primary care. She reported that she "never felt right since [her hospitalization]," that she was "essentially unable to work" due to "fatigue symptoms," and she was seeing a therapist for stress. (Id. at 751). She had returned to work the day before but had to go home because by noon "she felt she was drooping" and by 4:00 p.m., her legs were weak. (Id.). Dr. Faulkner declined to make "mak[e] any determination as to ongoing disability, and from review of each subspecialist she has seen in last few months, did not see a medical reason for her not to be able to work." (Id. at

5

752).  Dr. Faulkner noted that Plaintiff needed to "establish with a psychiatrist to come up with defined/structured plan for anxiety/stress coping/etc." and that Plaintiff's former primary care physician and neurologist "have heavily recommended psychiatry referral."  (Id. at 752, 758).[3]

While Plaintiff was receiving short-term disability benefits, she attempted to return to work on January 4, 2016, but by noon she began to exhibit symptoms of diminished strength and weakness, particularly in her legs.  By the time her husband came to pick her up to go home, she was experiencing near paralysis from her shoulders down her entire body.  According to Plaintiff, her husband had to drag her from the car into their home.  She remained on total bedrest for the next several days, and her leave from work, as well as her short-term disability benefits, were extended.  In late March 2016, Plaintiff saw Drs. Faulkner and Framm reporting an episode of fatigue and low blood pressure earlier in the month.  Dr. Framm attributed this to Plaintiff's reduced use of blood pressure medication.  (Id. at 736).

### E. Plaintiff Visits the Mayo Clinic

On April 26, 2016, Dr. Paola Sandroni initially evaluated at the Mayo Clinic and diagnosed Plaintiff with chronic fatigue syndrome with central sensitization.  (Id. at 233–35).  Dr. Sandroni did not believe that anything was "structurally wrong" and stated that Plaintiff's system needed to be "reset" and brought "into harmony."  Dr. Sandroni referred Plaintiff to Mayo's rehabilitation program for chronic fatigue.  (Id. at 234–35).  Plaintiff returned to the Mayo Clinic for pre-admission evaluations by various specialties on May 2 and 3.  See (Id. at 254–77).  Dr. Sandroni reported that "all the testing were really very benign" and "there is no evidence at this time of a significant autonomic problem or else," and that "with a good

---

[3]  On January 5, 2016, Dr. Faulker endorsed two to three weeks of disability for further evaluation.  That was the last time Dr. Faulker endorsed disability or work restrictions.  (Id. at 2974).

retraining program and the behavioral strategies, she will do fine." (Id. at 277). Dr. Kevin Fleming, also at the Mayo Clinic, noted that Plaintiff's presentation was consistent with chronic fatigue and explained that she should engage in "rehabilitative strategies," including "cognitive behavioral approaches, stress management, sleep hygiene, balanced lifestyle, moderation, energy conservation and graded exercise." (Id. at 261).[4]

Plaintiff was at the Mayo Clinic from May 25, 2016, through June 17, 2016. (Id. at 278–379). Her treatment included consultation and counselling, biofeedback-assisted relaxation psychological assessment, group therapy and occupational therapy, and exercise (stationary biking), treadmill (walking and jogging), weights, and biofeedback. Throughout the program, Plaintiff: (1) was able to actively participate in all group therapy and occupational therapy sessions; (2) was able to tolerate exercise and increase the impact of her exercise routine over time[5]; and (3) consistently noted the demands of her job and that she doubted she wanted to return to it. (Id. at 278, 281–82, 357).

Plaintiff's final diagnosis at the Mayo Clinic included chronic fatigue syndrome and central sensitization syndrome, which is a comorbid syndrome of overlapping conditions of fibromyalgia, myofascial pain, and chronic fatigue syndrome. At discharge, Plaintiff's occupational therapist reported that Plaintiff had "met all program Goals," would be discontinued from occupational therapy, and "plans to return to work/volunteer activities." (Id. at 367–68). The physical therapist reported marked improvement in Plaintiff's performance on a

---

[4] Plaintiff's reports to various Mayo Clinic staff are inconsistent. She told Dr. Sandroni that she had "no pain whatsoever at this time," "sleeps well," and "feels that her sleep is restorative," but told a nurse that she had pain throughout all extremities and her back since January and poor, unrefreshing sleep. (Id. at 233, 264–65).

[5] On June 6, 2016, Plaintiff walked 1.33 miles at 3.4 mph on an incline of 2% over 22 minutes. (Id. at 336).

battery of physical assessment tasks and prescribed an exercise plan, including range of motion, aerobics for 20 to 30 minutes, 3 to 5 days per week, and weight training for hips, knees, elbows, and shoulders.  Plaintiff had met short-term strength and conditioning goals and was to continue to work toward long-term goals.  (Id. at 378–79).

Dr. Larissa Loukianova noted that Plaintiff "demonstrated a significant decline in pain behaviors/pain-contingent lifestyle including preoccupation with symptoms or pain, limping, moving slowly, withdrawing avoiding activity."  (Id. at 373).  Plaintiff had "noted a significant improvement in endurance, strength, flexibility and overall aerobic conditioning . . . ."  (Id. at 374).  Dr. Loukianova noted a measurable decrease in Plaintiff's "depressive symptomology" and a normal mental status examination.  (Id.).

Dr. Daniel Rohe, a psychologist, reported a marked improvement in Plaintiff's mood since his initial meeting with her.  (Id. at 357).  Plaintiff discussed various plans for after discharge from the Mayo program.  She intended to (1) take her son out of daycare and prepare "theme weeks" for him; (2) assist with her husband's business; (3) travel to Michigan; and (4) hike and camp.  (Id.).  She was researching various educational and employment options, including nonprofit, auditing college level classes, practicing behavioral therapy, obtaining a real estate license, developing her blog, writing a book, and public speaking.  (Id.).  Shortly thereafter, Dr. Fleming stated that he supported short-term disability benefits, but "[l]ong-term disability is not recommended."  (Id. at 2095–96).

### F. Plaintiff's Treatment After Completion of the Mayo Clinic Program

Plaintiff presented to Dr. Faulkner on August 30, 2016, reporting regular exercise with improved strength and energy.  (Id. at 785).  However, about two weeks before, she was recovering from a cold and experienced weakness during exercise.  (Id.).  She did not lose the

8

ability to walk or speak but was "emotionally frustrated." (Id.). She indicated that her recovery time had been faster than previous occasions and that she was feeling stronger each day, and Dr. Faulkner recommended cautious re-introduction of her prior activity level. (Id. at 785, 790).

On October 3, 2016, Plaintiff attended the Mayo Clinic's Aftercare program. (Id. at 380–81). (Id. at 380). She was instructed to continue implementing behavioral skills, seek cognitive behavioral therapy, and return to the Aftercare program. (Id.).[6]

On December 15, 2016, she saw Dr. Faulkner for an upper respiratory infection, and made no reference to chronic fatigue. (Id. at 793–97). On January 31, 2017, she presented to her endocrinologist, who was occasionally treating her for benign thyroid nodules, and she was "doing well with the chronic fatigue program . . . ." (Id. at 803).

On April 2, 2017, Plaintiff presented at the Wake Forest Baptist Medical Center emergency department. See generally (Id. at 382–98). She had an episode of fatigue after doing a lot of walking on a trip with her choir group. She did not collapse but needed to lie down and had felt stiffness and shaking in her extremities. (Id. at 382). Plaintiff reported that her spells of extreme fatigue were spaced out every three to four months. (Id.). All clinical findings were normal except for "a mild anemia ...." (Id. at 384–85).

Dr. Ann Smith, an emergency medicine specialist, observed that Plaintiff exhibited "intermittent and distractible," "fatigable," and "highly suggestible" findings of weakness. She also observed one "spell" of closed eyes and stiffened back and extremities, but Plaintiff remained alert and oriented and there was no change in her blood pressure or heart rate. (Id.). Dr. Jared Hollinger, a neurologist, noted that Plaintiff displayed "minimal effort to

---

[6] The record does not reveal that Plaintiff returned for further participation in the Aftercare program after October 3, 2016.

spontaneously raise arms but is full strength with multiple distracting maneuvers in all extremities," that her neurologic exam was normal, and that her presentation "is very suggestive of a stress mediated conversion response," and her episodes are brief, suggestible, and resolve spontaneously. (Id. at 388–90). He did not recommend any treatment "as this can tend to create reinforcement of stress response and create a patient perception of acuity/urgency." (Id. at 390). On April 4, 2017, Plaintiff told Dr. Faulkner that she was improving daily and that she was planning to participate in a study at the National Institutes of Health. (Id. at 808, 813).

### G. Plaintiff Participates in a Study at the National Institutes of Health

On May 29, 2017, Plaintiff was accepted as part of the National Institutes of Health Program as a Myalgic Encephalomyelitis/Chronic Fatigue Syndrome patient, as part of protocol 16-N-0058, a diagnostic/treatment directive for selected patients with CFS. (Id. at 400).[7] Plaintiff underwent various clinical tests and was evaluated by various health care professionals. (Id. at 399–484). Dr. Brian Walitt, a rheumatologist, ultimately concluded that her sepsis-related event in September 2015 had triggered her ongoing CFS/CSS symptomatology, and that these symptoms were chronic, had a disabling effect on her daily activities, and that no treatment regimen currently existed. He further opined that there was "no anticipated improvement" in her prognosis, with functional capacity limitations at far less than a sedentary level.

Plaintiff showed a normal neurological examination, a normal battery of blood labs (except for an iron deficiency), and muscle strength of 5/5 bilaterally. (Id. at 402, 407, 413–15). While at NIH, Plaintiff reported having an episode of weakness during which she became unable

---

[7] Protocol 16-N-0058 is a research study involving candidates recruited from the general public. The first phase is a two- to five-day evaluation to determine if the patient is eligible for the study. Eligible patients are invited back for second inpatient visit of five to ten days. https://www.clinicaltrials.gov/ct2/show/NCT02669212.

to walk, but there were no witnesses. She recovered rapidly. (Id. at 424). Plaintiff was discharged from the study on June 9, 2017. (Id. at 399).

There are no further medical records in the file until December 6, 2017, when Plaintiff returned to Dr. Faulkner complaining of a cough. (Id. at 487). She was approximately 23 weeks pregnant. (Id. at 492). She displayed a normal gait, and chronic fatigue was not discussed. (Id. at 490).

**H. Video Surveillance of Plaintiff Taken in January 2018**

On Tuesday, January 23, 2018, Plaintiff was recorded actively outside her home over six hours, in which she drove, shopped, fueled her car, used her cell phone, carried items, visited various offices, had her car serviced, walked 0.2 miles with her young son, engaged in a conversation while standing on the sidewalk for thirteen minutes, walked back home (continuing to walk after the child was driven the remainder of the way home by a relative), entered her home, and used a computer while sitting upright. (Id. at 206–11, 141–42).

**I. Plaintiff Submits Her Claim for Long-Term Disability**

Aetna paid short-term disability benefits beginning September 28, 2015, until January 5, 2016. Defendant therefore discontinued benefits after determining that Plaintiff's condition did not qualify her for ongoing benefits pursuant to the terms of the Plan. (Id. at 3186). Plaintiff filed a lawsuit against Aetna for short-term disability benefits on January 27, 2017, which was settled and dismissed on January 15, 2018. (No. 3:17-cv-38 (W.D.N.C.)).

On February 8, 2018, with the short-term disability lawsuit over, Plaintiff submitted a claim for long-term disability benefits. (AR at 519). In addition to the medical record, discussed above, Plaintiff submitted a personal statement, (id. at 502, 514–18), and a statement from Dr. Walitt, (id. at 512–13, 817, 829). In her statement, dated January 30, 2018, Plaintiff described

11

herself as essentially incapable of doing anything and constantly being on "the cusp of an episode." (Id. at 516). She reported that she can barely dress or maintain personal hygiene, participate in caring for her son, or engage in household activities. (Id. at 516–17). She further reported that she can walk no further than to the end of her block. (Id. at 517). She stated she has difficulty driving and limits driving to short intervals because concentration causes exhaustion. (Id. at 518). She also claimed that she cannot socialize or engage in extended conversations. (Id.).

Plaintiff's personal statement contrasts starkly with (1) the level of activity, including strenuous exercise, recorded during her time at the Mayo Clinic; (2) Plaintiff's self-reports of activities at the aftercare visit to the Mayo Clinic (including completing a five-kilometer race); (3) reports to her local physicians after returning from the Mayo Clinic; and (4) the video surveillance. It is also inconsistent with her reporting no more than three "episodes" to her doctors in approximately 18 months from her discharge from the Mayo Clinic on June 17, 2016, through January 30, 2018. Those episodes were reported to have occurred August 30, 2016, April 2, 2017 and June 3, 2017. (Id. at 382, 424, 785).

Before that time, aside from the initial onset of her symptoms in September/October 2015, Plaintiff had had one other episode in March 2016. (Id. at 767). Dr. Walitt tendered an attending provider statement dated January 23, 2018, stating that "[Plaintiff] is unable to provide reliable capacity for work. Her function is such that she could become unable to function at any time." (Id. at 817). Dr. Walitt diagnosed Plaintiff with "post-infection chronic fatigue syndrome." (Id.). Dr. Walitt also signed a typed statement describing Plaintiff's limitations as Plaintiff had described them to Dr. Walitt. (Id. at 512–13). The statement includes, among other things, the following: "[Plaintiff] has very short periods of energy (physically, cognitively,

12

behaviorally), which affects all activities regarding self-care or household activities"; she "engages in light and short-lived household talks to try to preserve what little strength she has"; she "saves energy by resting during the day to be able to communicate and interact with son before and after school"; "time engagement diminishes further during exacerbations of the disease" and "[d]uring exacerbations, reliance on others for self-care and household activities becomes critical"; and she "tries to persevere through sadness, from unrelenting fluctuations with chronic fatigue, to cope with loss of major life roles involving work, home maintenance, and outdoor physical activities and the compromised roles concerning her activities as mother, wife, friend, and community service."  (Id.).

Dr. Walitt notes that he first saw Plaintiff on May 29, 2017, and last saw her on June 8, 2017, which dates coincide with her stay at NIH, nearly seven months before he tendered the attending provider statement and the accompanying narrative.  He was not treating Plaintiff when he tendered those documents.  Rather, he saw her for several brief evaluations while at NIH and prepared a narrative based on Plaintiff's subjective history and in the context of assessing her for inclusion in a study.  (Id. at 441–45).

### J. Aetna Denies Plaintiff's Application for Long-Term Disability Benefits

By letter dated March 27, 2018, Defendant Aetna denied Plaintiff's application for long-term disability benefits.  (Id. at 1799–1801).  Therein, Aetna established that due consideration had been given to the medical records and other submissions by Plaintiff and her counsel.  Aetna found that "there is insufficient medical evidence to substantiate a functional impairment of any level or duration."  (Id. at 1800).  Aetna referenced the panoply of normal clinical findings, Plaintiff's improvement after the Mayo Clinic program, and the skepticism expressed by

multiple treating physicians, including those at Wake Forest and NIH as to the authenticity of her symptoms. (Id.).

Aetna related the numerous physicians' expressions that her symptoms were psychological and the absence of empirical evidence of a functional impairment. (Id.). Aetna addressed the possibility of a behavioral impairment but noted accurately that Plaintiff (despite the recommendations of numerous physicians) had not provided documentation of substantive behavioral or psychiatric treatment, and a psychological impairment could not be supported. (Id.). Aetna advised Plaintiff of her appeal rights and identified in detail the forms of additional information that she might submit in support of an appeal. (Id.).

### K. Plaintiff Appeals Aetna's Decision

By letter dated May 7, 2018, Plaintiff appealed. (Id. at 68). She did not submit any additional information or documents in support of her appeal. Aetna engaged a peer review consultation by Wendy Weinstein, M.D., Board Certified in Internal Medicine, who tendered a report dated June 5, 2018. (Id. at 53–67). Dr. Weinstein attempted unsuccessfully to speak with Drs. Framm and Faulkner. (Id. at 64). Dr. Weinstein reviewed all medical information in the record. (Id. at 56–63). She found no evidence in the record of a functional limitation from March 29, 2016, forward.[8] (Id. at 65). Dr. Weinstein noted that (1) there was no anatomic or physiological basis supporting a finding that Plaintiff could not walk; (2) diagnostic studies were negative; (3) there was no documentation that Plaintiff had loss of her upper extremities or of a need for work restrictions that would preclude her from continuously sitting, occasionally standing, walking, and lifting up to ten pounds, or using her upper extremities for continuous

---

[8] This was the first potential LTD eligibility date under the Own Occupation definition of "disability."

grabbing, grasping, or fine manipulation; (4) the records exhibited evidence of poor effort and emotional overlay; (5) the records exhibited reference to anxiety, adjustment reaction, and somatoform disorder by multiple providers; and (6) the Mayo Clinic records did not document any physical functional impairments precluding her from sitting, standing, walking, and lifting up to ten pounds. (Id.). "[F]rom an internal medicine perspective, there [was] no documentation of functional impairment [that] would preclude claimant from working" eight hours a day/five days a week. (Id. at 65–66). Dr. Weinstein further explained that Plaintiff's complaints of exhaustion were self-reported, that Plaintiff also self-reported that she was also engaged in various activities, and that "she has received regular care for her subjective complaints but there is no documentation of an actual functional impairment that would preclude the claimant from working while she attended to her evaluation and treatment." (Id. at 66).[9]

David Maroof, PhD, ABPP, Board Certified in Clinical Psychology and Clinical Neuropsychology, reviewed the record and tendered a report dated June 8, 2018. (Id. at 44–51). Dr. Maroof concluded that Plaintiff "has an anxiety disorder and functional neurological disorder." (Id. at 51). He also stated, however, that there was no evidence that these conditions resulted in restrictions or limitations from March 29, 2016, to present. (Id.). He based this conclusion on the behavioral and cognitive observations of Plaintiff's treating physicians. (Id.). He stated that "there was no compelling evidence that she was functionally compromised" and she had not been referred to a higher level of care. (Id. at 52).

**L. Aetna Upholds the Decision to Deny Long-Term Disability Benefits on Appeal**

---

[9] Aetna sent a copy of the Dr. Weinstein's report to Dr. Faulkner for comment but received no response. (Id. at 1804).

By letter dated July 6, 2008, Aetna informed Plaintiff of its decision to affirm the claims determination that she was not eligible for long-term disability benefits.  (Id. at 1821–22).  Aetna explained the analysis and conclusions of Drs. Weinstein and Maroof and explained that "there is no medical evidence to support any exertional or non-exertional restrictions or limitations that would preclude or limit her ability to perform her own occupation."  (Id. at 1822).

## II.    STANDARD OF REVIEW

The abuse of discretion standard applies to reviews of denial-of-benefits claims challenged under 29 U.S.C. § 1132(a)(1)(B) where, "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); see also Williams v. Metro. Life Ins. Co., 609 F.3d 622, 629–30 (4th Cir. 2010) (reservation of discretionary authority requires abuse of discretion standard of review).  As noted above, the Plan in this action confers the requisite discretionary authority.  Accordingly, the abuse of discretion standard applies in this case.

The abuse of discretion standard is the most deferential review standard in American jurisprudence.  Cosey v. Prudential Ins. Co. of Am., 735 F.3d 161, 168 (4th Cir. 2013); Brown v. Nucor Corp., 785 F.3d 895, 928 (4th Cir. 2015).  "When a plan by its terms confers discretion on the plan's administrator to interpret its provisions and the administrator acts reasonably within the scope of that discretion, courts defer to the administrator's interpretation." Colucci v. Agfa Corp. Severance Pay Plan, 431 F.3d 170, 176 (4th Cir. 2005).  Thus, courts "will not disturb a plan administrator's decision if the decision is reasonable, even if [they] would have come to a contrary conclusion independently." Williams, 609 F.3d at 630.  A plan administrator's decision is reasonable "if it is a result of a deliberate, principled decision process" supported by

"substantial evidence." Evans v. Eaton Corp. Long Term Disability Plan, 514 F.3d 315, 322 (4th Cir. 2008) (internal quotation and citation omitted).

In Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan, 201 F.3d 335, 342–43 (4th Cir. 2000), the Fourth Circuit enumerated the following, eight nonexclusive factors to be considered in reviewing the reasonableness of an administrator's decision:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Champion v. Black & Decker (U.S.) Inc., 550 F.3d 353, 359 (4th Cir. 2008) (quoting Booth, 201 F.3d at 342–43).

### III.    DISCUSSION

### A.    Application of the Booth Factors in Determining the Reasonableness of Aetna's Decision

### 1.    First and Second Booth Factors

As to the first and second Booth factors—the plan's language and purpose—the Plan requires that for a participant to be eligible for long-term disability benefits, the participant must be unable to perform the material duties of her own occupation solely because of an injury or illness. (Refaey Policy at 261). After the first eighteen months that benefits are payable, a participant meets the Plan's test of disability if she is unable to perform any reasonable occupation because of injury or illness. (Id.). Furthermore, the Plan's goal is to provide eligible employees an income source should they become disabled because of illness or injury. (Id. at 260). The Plan sets forth specific and precise conditions that must be met for a participant to

qualify for benefits. Inherent to the Plan's goals is that only participants who actually become disabled under the Plan terms should receive benefits. A prudent claims administrator is charged with the responsibility of both honoring valid claims as well as denying invalid claims. DiFelice v. U.S. Airways, Inc., 497 F.3d 410, 418–19 (4th Cir. 2007) (noting that ERISA "fiduciaries must exercise prudence in administering a plan" and "must also scrupulously adhere to a duty of loyalty, and make any decisions in a fiduciary capacity with 'an eye single to the interests of the participants and beneficiaries'") (quoting Kuper v. Iovenko, 66 F.3d 1447, 1458 (6th Cir. 1995)).

In denying Plaintiff's claim, Aetna expressly relied on and referenced the Plan terms concerning the test of disability, as they are quoted verbatim in the introductory passages of the denial letter. (AR 1799). Aetna clearly explained as the reason for its decision that, based on the medical information submitted and reviewed in support of Plaintiff's claim, the medical evidence failed to support a physical or psychological impairment precluding Plaintiff from performing her own occupation or any occupation. (Id.). Aetna engaged in the same analysis with reference to the Plan terms on appeal. This Court finds that, applying the first two Booth factors, Aetna's decision is consistent with the Plan's language and goals.

### 2. Third Booth Factor

Next, as to the third Booth factor—adequacy of the materials considered to make the decision and the degree to which they support it—the record shows that Aetna fully considered all of the medical records and other materials submitted by Plaintiff in support of her claim, as itemized in detail in the denial decision letter. (Id. at 1780). Moreover, Aetna provided those materials to two peer reviewing physicians for consideration, both of whom confirmed that they had considered all of the materials and opined the medical evidence did not support a functional impairment. (Id. at 45–50, 56–63). As explained in more detail below, the medical record

18

includes medical evidence contrary to Plaintiff's contentions and lacks any clear, express statement by a medical professional that Plaintiff was functionally impaired in a manner that would preclude her from working. Moreover, the opinions of Drs. Weinstein and Maroof and the contents of the surveillance video provided substantive affirmative evidence to refute Plaintiff's subjective reports.[10] Thus, the Court finds that application of the third <u>Booth</u> factor supports a finding that Defendant did not abuse its discretion in denying Plaintiff benefits.

In her opposing brief, Plaintiff maintains that Dr. Maroof's opinion is flawed because he does not acknowledge Houlihan's reported observation of Plaintiff "at times" having difficulty sustaining "concentration for the full 50-minute session or to think ahead and plan when she's tired." (Doc. No. 26 at p. 2). Dr. Maroof, who is board-certified in clinical psychology, was not retained to evaluate Plaintiff's reported symptoms of weakness and fatigue. Rather, he was retained to ascertain whether Plaintiff was suffering from a psychiatric condition. (AR 51). Moreover, Dr. Houlihan's contribution to the Record is limited to one letter, of two pages, drafted by Dr. Houlihan in connection with Plaintiff's social security disability claim. (<u>Id.</u> at 485–86). Therein, Dr. Houlihan states that she is "not trained to determine how physical impairments translate to work-related activities, and I have not conducted a neuropsychological assessment to address questions related to cognitive impairment." (<u>Id.</u> at 486). While Dr.

---

[10]  Plaintiff contends that Aetna's decision to deny long-term disability benefits was entirely reliant on the opinions of Drs. Wendy Weinstein and David Maroof and that Aetna unreasonably relied on those opinions because the doctors ignored credible evidence. The Court does not agree. Aetna's decision was not based entirely on the opinions of Drs. Maroof and Weinstein. Rather, it was based upon a holistic analysis of the Record as demonstrated in the initial denial letter dated March 27, 2018, (AR 1799–1800), that was reaffirmed on appeal with the additional input of Drs. Maroof and Weinstein. (AR 1821–22). ("In order to give all due consideration, and ensure a full and fair claim review, the medical data in the STD and LTD claim files were sent for two additional independent physician reviews for both behavioral health and physical medicine conditions.").

Houlihan notes certain observations of Plaintiff behaving in a manner suggesting fatigue, those observations are not attributed to a clinical psychological diagnosis. (Id.). Dr. Houlihan does not (and, based on her own statements, cannot) offer an opinion as to whether those behaviors are genuine and, if so, the extent to which they translate to a functional limitation. (Id.). Therefore, her letter does not speak to whether Plaintiff is functionally impaired due to a psychological condition.

Specifically, as to Dr. Weinstein's opinion, in arguing that Dr. Weinstein ignored credible objective evidence, Plaintiff criticizes Dr. Weinstein's review with reference, once again, to Dr. Houlihan's observations. Dr. Houlihan expressly stated that she was not trained to opine as to how physical impairments may limit work-related activity. (Id.). She also stated that she had not obtained objective evidence in the form of a neuropsychological assessment. (Id.). The observations she reports, while disclaiming any medical expertise to diagnosis a condition or identify a functional limitation arising from the same, are observations that any layperson could make based on casual interaction. Simply stated, Dr. Houlihan's comments are of no clinical value and do contain any discernable evidence pertinent to Dr. Weinstein's review.

Plaintiff also argues that Dr. Weinstein failed to acknowledge the tilt table tests performed by Plaintiff's cardiologist, Dr. Framm, and again later by Dr. Walitt. (Doc. No. 26 at p. 4). Dr. Weinstein, however, expressly addressed the November 17, 2015, tilt table test administered by Dr. Framm and observed that "the claimant did not actually meet the criteria for orthostatic hypotension" because that criteria calls for a 20-point change in blood pressure, which she did not have. (AR 59). On the same subject, Dr. Weinstein noted, "there is no documentation that [Plaintiff] had physical restrictions and limitations based on her relatively low baseline blood pressure." (Id. at 65). Dr. Weinstein's opinion is consistent with the May 2,

2016, reported findings of Dr. Robert Rea, cardiologist at the Mayo Clinic, in which Dr. Rea reported that "[f]rom a cardiovascular standpoint, I find no abnormalities of note." (Id. at 256). Likewise, an "autonomic reflex screen showed no orthostatic hypotension." (Id.). A tilt table test administered at Mayo Clinic on the same date confirmed "no hypotension." (Id. at 261). Interestingly, Dr. Rea reported that during an exercise electrocardiogram ("ECG") study, Plaintiff exhibited limited effort but "became unstable on her feet, lost all motor function, but was conscious to her surroundings. According to notes from the ECG exercise laboratory, the blood pressure and heart rate were normal at this time." (Id. at 256).

Plaintiff has endorsed the Mayo Clinic as being authoritative. (Doc. No. 22 at p. 22). She has also eschewed Dr. Framm's diagnosis of orthostatic hypotension as a cause of her weakness and fatigue as incorrect. (AR 509). While it is true that Plaintiff underwent a tilt table test while at the NIH with Dr. Walitt, he does not cite to the results of that test in rendering any of his stated opinions. Dr. Weinstein accurately noted that the Mayo Clinic ruled out orthostatic hypotension. Accordingly, it was reasonable for Dr. Weinstein to treat that issue as it appears in her report.

Plaintiff also accuses Dr. Weinstein of ignoring a report from a cardiovascular stress test performed at the Mayo Clinic on April 27, 2016, during Plaintiff's preadmission evaluation. (AR 228). Plaintiff asserts that Dr. Weinstein ignored that Plaintiff "lost all motor function less than five minutes into the test." (Doc. No. 26 at p. 5). First, this information is not objective data. The report conveys a behavior that Plaintiff displayed. (AR 228).[11] Second, her displayed behavior was not relevant to test's purpose, which was to ensure that Plaintiff was of sufficient

---

[11] The contents of the same document cast doubt on the credibility of Plaintiff's presentation during the stress test, as it is also noted that she displayed "sub-maximal effort." (Id.).

cardiovascular health to participate in a further study, as she was deemed capable of doing. (Id.). Third, no physician has been identified by Plaintiff as pointing to her behavior during the stress test as clinical evidence supporting her assertion that she is functionally impaired. Fourth and finally, the behavior she displayed is inconsistent with the exercise tolerance she exhibited, including walking and jogging on a treadmill, during her participation in the Mayo Clinic rehabilitation program. (Id. at 305–06, 336–37, 349–50). Clearly, in relation to the volume of medical record reviewed by her, this particular record could be reasonably viewed as not being particularly relevant to Dr. Weinstein's analysis.

While purporting to argue her point on the basis of objective evidence, Plaintiff also relies on distinctly subjective information. For example, Plaintiff refers to the narrative of her aborted return to work, which is nothing more than an uncorroborated, subjective historical report. She also accuses Dr. Weinstein of failing to "reference Plaintiff's 'crash' at the Mayo Clinic while undergoing her rehabilitative program." (Doc. No. 26 at pp. 4–5). In support, Plaintiff cites to AR 401, which is actually an NIH record, not a Mayo Clinic record recounting yet another uncorroborated, subjective report by Plaintiff, this time of an episode that allegedly occurred on June 3, 2017.

In her response, Plaintiff is essentially asserting that if a plaintiff in a denial of benefits case can simply identify information in the medical record that is not expressly and specifically addressed in a peer review physician's report, the opinion is flawed and the Plan's reference to that opinion is unreasonable. Plaintiff is incorrect for at least three reasons. First, the fact that Dr. Weinstein's opinion does not expressly discuss a discrete clinical test or observation does not mean she did not consider it. The list of documents reviewed by Dr. Weinstein is 2.5 pages long. (AR at 54–56). Second, the mere presence of information in the medical record does not render

22

that information credible medical evidence. As explained above, with respect to each item identified by Plaintiff, there is ample basis to reasonably view the information as either irrelevant, unreliable, or both. Third, and perhaps most importantly, Plaintiff fails to explain to the Court how or why this information matters to her claim or should have mattered to Aetna's analysis. She simply identifies data points, accuses Dr. Weinstein of ignoring them, and declares that Aetna was unreasonable. At no point in her Response does Plaintiff coherently articulate how the information supports her claim, or how the information could or should have changed Dr. Weinstein's analysis.

In her response, Plaintiff also criticizes Dr. Weinstein for having not made telephone calls to Drs. Fleming and Walitt. As explained therein, Dr. Weinstein spoke to Dr. Mark Hines, whose January 6, 2016, letter appears in the Record. (AR 224–27). When Dr. Weinstein spoke to Dr. Hines, he did not support Plaintiff's disability claim. (Id. at 64). She attempted unsuccessfully to speak to Drs. Framm and Faulkner, (Plaintiff's cardiologist and primary care physician, respectively).[12]

As noted in Aetna's Response, Dr. Fleming of the Mayo Clinic issued a written statement declining to recommend long-term disability. (Id. at 2096). Dr. Weinstein was in possession of

---

[12] Plaintiff argues in part that Dr. Weinstein's peer-to-peer efforts were unreasonable because she sought to speak only to physicians that treated Plaintiff before the applicable LTD period, which began March 29, 2016. This is not accurate. Plaintiff made multiple visits to Drs. Framm and Faulkner during the period starting March 29, 2016. (AR 487–501, 736–43, 776-99, 807–15). In fact, the last recorded medical consultation appearing in the Record is an office visit note from Dr. Faulkner dated December 6, 2017. (Id. at 487). Plaintiff presented complaining of a cough, was approximately 23 weeks pregnant, displayed a normal gait, and was not reported to have made complaints of fatigue. (Id. at 490–92). Notably, that office visit took place almost six months after Plaintiff's discharge from the phenotyping evaluation at NIH. About one and one-half months later, Dr. Walitt tendered his Attending Physician Statement (January 23, 2018) and his narrative statement provided in support of Plaintiff's long-term disability claim (January 24, 2018). (Id. at 512, 817). Curiously, Plaintiff did not submit an Attending Physician Statement from Dr. Faulkner (her primary care physician) in support of that claim.

that statement.  (<u>Id.</u> at 62).  Since Dr. Fleming's opinion did not support Plaintiff's, there is no basis upon which it could be viewed as conflicting evidence warranting examination by the peer reviewer.

### 3.  Fourth <u>Booth</u> Factor

As to the fourth <u>Booth</u> factor—whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan—as explained above, Aetna's decision is consistent with the pertinent Plan provisions.  Aetna is afforded discretion to make decisions of benefit eligibility under the Plan definition of "disability."  The record contains no evidence of any inconsistencies between Aetna's decision and any previous interpretations of the Plan.  Thus, application of this factor weighs in favor of finding that Aetna's decision was reasonable.

### 4.  Fifth <u>Booth</u> Factor

Next, as to the fifth <u>Booth</u> factor—whether Defendant's decision-making process was reasoned and principled—Plaintiff sought long-term disability benefits, alleging that she suffers from persistent, debilitating fatigue.  (AR 516–18).  The sole physician endorsing her claim for long-term disability benefits, Dr. Brian Walitt, tendered a diagnosis of chronic fatigue syndrome. (<u>Id.</u> at 829).  However, all of the information about symptoms described by Plaintiff in support of her claim is subjective.  (<u>Id.</u> at 516–18).  Likewise, all of the information reported by Dr. Walitt within the narrative appended to his Attending Physician's Statement, and in the narrative composed and included as part of the NIH records, is based on Plaintiff's subjective reports of fatigue and associated distress.  (<u>Id.</u> at 441–45, 512–13).  As part of a reasoned and principled decision-making process, while subjective complaints cannot be dismissed out of hand, Aetna is not required to simply accept Plaintiff's subjective reports of allegedly debilitating fatigue.

DuPerry v. Life Ins. Co. of North America, 632 F.3d 860 (4th Cir. 2011). Further, in rendering this analysis, the Plan is not required to defer to the disability opinion of treating physicians, particularly where that opinion is not supported by medical evidence. Austin v. Continental Cas. Co., 216 F. Supp. 2d 550 (W.D.N.C. 2002).

To begin, Plaintiff's claim for long-term disability benefits simply is not accompanied by a credible endorsement of a treating physician. Plaintiff has presented one physician's opinion in support of her claim for long-term disability benefits, that of Dr. Walitt. However, Defendant notes that Dr. Walitt did not treat Plaintiff and she was not under his care at the time he tendered an attending physician's statement in January 2018. (AR 441–45). His opinion is simply a reiteration of Plaintiff's subjective narrative taken in early June 2017. (Id.). His APS plainly states that his interaction with Plaintiff was limited to a little more than a week in late May and early June. (Id. at 817). The record shows that Dr. Walitt's role in Plaintiff's course of treatment was not treatment at all, but rather, evaluation of her suitability for a research study, in which she was apparently not ultimately included. (Id. at 400).

Even if Dr. Walitt's opinion is fully credited, it does not, on its face, support Plaintiff's claim. Dr. Walitt's express opinion is that Plaintiff "is unable to provide reliable capacity for work. Her function is such that she could become unable to function at any time." (Id. at 817). The record demonstrates, by Plaintiff's own reports, that episodes of loss of functionally are spread out over months at a time, with the last three reported events occurring over an eighteen-month period. (Id. at 382, 424, 785). Walitt does not state that Plaintiff cannot work. He states that she may at times become unable to work. (Id. at 817). The situation he describes, coupled with the realities shown in the record, is that Plaintiff may require occasional, unexpected absences from work. (Id.). This does not logically rise to the level of a functional impairment

25

precluding her from performing the materials duties of her own or any reasonable occupation, as occasional absences are normal and expected events for all employees, and are accounted for in the federal scheme of employee protections, such as intermittent leave under the FMLA.

While the record demonstrates a course of treatment over more than two years involving numerous physicians representing a variety of institutions and specialties (several of whom offered attending physician statements in support of her claim for short-term disability),[13] Plaintiff offers Dr. Walitt, alone, in support of her long-term disability claim. None of the numerous physicians who actually performed substantive, clinical examinations of Plaintiff while at NIH or the Mayo Clinic have been offered in support of her claim for long-term disability, and none of their records support the claim.

On or about June 30, 2016 (notably a few weeks after Dr. Walitt's last meeting with Plaintiff), Dr. Fleming of the Mayo Clinic expressly stated that "[l]ong-term disability is not recommended." (Id. at 2095–96). Previously, on November 4, 2015, neurologist Dr. Lin prescribed a referral for evaluation for chronic fatigue syndrome and stated that he "would" approve 2 more weeks of short-term disability "but none beyond." (Id. at 894). Dr. Faulkner had also noted that the reviews by specialists did not support disability. (Id. at 752).

In addition to Plaintiff's reliance on her own subjective narrative as recorded by Dr. Wallitt, her claim is undermined due to the absence in the record of objective proof of a disease

---

[13]  See, e.g., Dr. Teague (primary care), October 2, 2015, STD from September 27, 2015 (date of first ER visit) to "TBD by neurology" (AR 3355); Dr. Huber (emergency medicine), October 20, 2015, STD from September 27, 2015 until cleared by primary care physician (Id. at 3086); Dr. Lin (neurology), November 2, 2015, 30 days (Id. at 3083); Dr. Faulker (primary care), January 5, 2016, STD while evaluated by specialists, "hopefully 2-3 weeks" (Id. at 2974); Dr. Hines (pain management), January 12, 2016, full recovery in 1 year (Id. at 2968) (based on diagnosis of suspected myasthenia gravis, expressly rejected by Plaintiff as incorrect, id. at 509).

that could cause her alleged symptoms.[14]  All pertinent clinical testing relating to her neurological and muscular condition was negative or normal.  (Id. at 65, 277, 388–90, 407, 413 415, 893, 900–01, 903, 915, 1097).  The record bears out that chronic fatigue was identified based solely on subjective reports that could not be explained by any empirically discernable disease process.  (Id. at 66, 235, 277).  In addition to being entirely predicated on subjective reports and not supported by medical proof of an underlying condition, Plaintiff's own treating physicians cast doubt on her claim.  Dr. Lin characterized Plaintiff's exhibitions of weakness during neurological examinations as "possibly extinguish[ing] with repeat testing," "possibly questionable … weakness that appear to be improved with distraction."  (Id. at 893, 914–15). Dr. Patel reported "significantly poor effort" by Plaintiff during electrodiagnostic testing of her legs.  (Id. at 1097).  Dr. Smith at Wake Forest described Plaintiff's exhibited weakness as "intermittent and distractible," "fatigable," and highly suggestible" and noted that Plaintiff's vital signs were unchanged while she exhibited a "spell."  (Id. at 384–85).  Dr. Holinger, a Wake Forest neurologist, offered a similar report stating that her presentation "is very suggestive of stress mediated conversion response" and expressly recommended no further treatment in order to avoid reinforcement of her stress response."  (Id. at 388–90).

In addition to the skepticism expressed by several treating physicians, Plaintiff's recorded and self-reported activities contradict her assertions of disability.  She engaged in a program of strenuous physical exercise at Mayo Clinic during which she consistently increased the level of exertion, along with active participation in daily occupational therapy.  (Id. at 305–06, 336–39, 349–50, 352–54, 378–79).  She displayed marked improvement during her stay at the Mayo

---

[14]  See, e.g., DuPerry, 632 F.3d at 868 (noting that subjective complaints should not be dismissed out of hand, especially where there is objective medical proof of a disease that could cause symptomology).

Clinic.  (Id. at 357, 367–68, 373–74, 378–79, 2095–96).  Finally, she reported improvement of symptoms and activities consistent with a normal level of functionality after leaving the Mayo Clinic.  (Id. at 380, 803, 813).  Conversely, Plaintiff has presented no evidence, such as a sworn statement, statements from family and friends, or recorded evidence of her alleged daily lifestyle to corroborate her subjective reports of fatigue and diminished capacity.

Finally, the record demonstrates that immediately before the onset of her alleged symptoms, Plaintiff was profoundly unhappy with her job, and that she had no intention of returning to it, even if fully recovered.  (Id. at 278, 281–82, 357, 445, 611, 914).  The record demonstrates a consistent theme of attribution of her symptoms (by her treating physicians and even herself) to, and coincidence with, psychological stressors.  (Id. at 357, 374, 406, 611, 716–18, 752, 758, 895).

Plaintiff's own medical record and submissions, alone, constitute a reasonable basis for Aetna's decision to deny her request for long-term disability benefits.  Yet, even in the absence of objective proof of a medical condition or reliable subjective evidence of Plaintiff's claimed symptomology, Aetna came forward with affirmative evidence in contradiction of Plaintiff's subjective assertions.  Aetna obtained surveillance video that undermines Plaintiff's description of her condition by showing her engaged in sustained, normal activity that is completely inconsistent with her asserted profound weakness and debilitation.  (Id. at 206–11, 141–42 [documents out of sequence]).  Moreover, and perhaps more importantly, Aetna obtained peer review reports from two board certified physicians who conducted thorough reviews of the medical record, and attempted, without success, to obtain information from various treating physicians to corroborate Plaintiff's claims, and conclusively determined that the medical record does not evidence any functional limitation precluding Plaintiff from working.  (Id. at 45–51, 53

28

67). All of the foregoing demonstrates an objectively reasonable basis for Aetna to determine that there was no evidence to support a conclusion that Plaintiff suffered from a functional impairment that precluded her from working.

### 5. Sixth **Booth** Factor

Next, as to the sixth Booth factor—whether the decision was consistent with the procedural and substantive requirements of ERISA—"ERISA requires that plan participants be notified in writing of any benefit denial, and that they be given an opportunity for a full and fair hearing by those denying the claim." Fuqua v. Tarmac of Am., Inc., 228 F. Supp. 2d 755, 762 (E.D. Va. 2002) (citing 29 U.S.C. § 1133). Here, Aetna carefully reviewed Plaintiff's claim and accepted all evidence she elected to present in support of her claim, and issued a written decision explaining the reasoning underlying the denial of benefits. Aetna also invited Plaintiff to provide further documentation to support her claim and specifically identified documents she might submit, but Plaintiff elected to submit no additional evidence on appeal. Nevertheless, Aetna engaged two medical peer reviewers as part of its consideration of her appeal and gave her primary care physician an opportunity to respond to the same. Because Aetna afforded Plaintiff a full and fair review of her claim, its decision is consistent with the requirements of ERISA.

### 6. Seventh **Booth** Factor

Next, as to the seventh Booth factor—any external standard relevant to the exercise of discretion—there is no additional external standard of review relevant to Aetna's exercise of discretion. Its discretionary authority is established by the Plan language and the relevant case law cited above.

### 7. Eighth **Booth** Factor

Finally, as to the eighth <u>Booth</u> factor, while a structural conflict of interest may exist, there is no evidence in the record that Aetna's decision was influenced by a conflict. Moreover, Plaintiff made no effort to seek discovery on the subject of conflict of interest and has not presented any evidence in that regard.

In sum, "[Plaintiff] has the burden to prove that she is entitled to receive disability benefits under the Plan." <u>Donnell v. Metro. Life Ins. Co.</u>, 165 Fed. Appx. 288, 296, n.9 (4th Cir. 2006) (citing <u>Ruttenerg v. U.S. Life Ins. Co.</u>, 413 F.3d 652, 663 (7th Cir. 2005) ("ERISA plaintiffs must prove that their insurance contract entitles them to benefits")). <u>See also</u> <u>Clark v. Nationwide Mut. Ins. Co.</u>, 933 F. Supp. 2d 862, 869 (S.D. W. Va. 2013) ("It is the plaintiff's burden to demonstrate entitlement to benefits under an ERISA plan."). "[T]he law places the burden squarely on Plaintiff to prove, affirmatively, that she is entitled to pension benefits under the Plan." <u>Whelehan v. Bank of Am. Pension Plan for Legacy Companies-Fleet-Traditional Benefit</u>, 5 F. Supp. 3d 410, 423 (W.D.N.Y. 2014). "The court considers this allocation of the burden of proof when conducting a review of the decision of a plan fiduciary, although it must do so in light of the degree of discretion under which the fiduciary acted." <u>Catledge v. Aetna Life Ins. Co.</u>, 594 F. Supp. 2d 610, 624 (D.S.C. 2009). Plaintiff has failed to prove that Aetna's decision was unreasonable under the <u>Booth</u> factors.

### B.     Bank of America's Summary Judgment Motion

As noted, Defendant Bank of America has also filed a motion for summary judgment, arguing that it is entitled to summary judgment on the ground that it was not responsible for payment to Plaintiff. The Court agrees. In any event, because the Court finds that Aetna's decision regarding long-term disability was not abuse of discretion, the Court finds that Bank of America is entitled to summary judgment for this reason also.

## V.     CONCLUSION

For the reasons stated herein, the Court finds that Defendant Aetna did not abuse its discretion in denying long-term benefits to Plaintiff.  Thus, Defendants are entitled to summary judgment.

**IT IS THEREFORE ORDERED THAT:**

(1) The Motion for Summary Judgment filed by Plaintiff Claire Refaey, (Doc. No. 21), is **DENIED**;

(2) The Motion for Summary Judgment filed by Defendant Aetna Life Insurance Company, (Doc. No. 23), is **GRANTED**.

(3) The Motion for Summary Judgment filed by Defendant Bank of America Corporation, (Doc. No. 24), is **GRANTED**.

Signed: June 18, 2020

Max O. Cogburn Jr.
United States District Judge